# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00732-STV

JONATHAN BURLEIGH BARNTHOUSE,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

      Defendant.

_____

## ORDER
_____

Magistrate Judge Scott T. Varholak

      This matter is before the Court on Plaintiff Jonathan Barnthouse's Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq.*, and 1381-83c, respectively. [#1] The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2. [#14] The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#12], the parties' briefing [##16, 17, 18], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal. For the following reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** for further proceedings.

## I.    LEGAL STANDARD

### A.    Five-Step Process for Determining Disability

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[1]   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment."  *Lax*, 489 F.3d at 1084.   "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."   42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled."  *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).  The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

---

[1] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910; *see also* 20 C.F.R. §§ 404.1572, 416.972.

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[2]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four, after which the burden shifts to the Commissioner at step five to show that claimant retains the ability to perform work in the national economy. *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084. "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis." *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo. 2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

## B. Standard of Review

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and

---

[2] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).

whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)). "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Bailey*, 250 F. Supp. 3d at 784 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)). The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted). The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Hackett*, 395 F.3d at 1172.

## II.    BACKGROUND

Plaintiff was born in 1975. [AR 85][3] Plaintiff completed high school and four years of college education. [AR 203] Plaintiff is able to communicate in English.[4] [AR

---

[3] All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case. [#12]

[4] Plaintiff indicated that he could speak and understanding English. [AR 201] On the same form, Plaintiff also indicated that he could not read or understand English, or write more than his name in English. [*Id.*] In light of other documents in the record, including

201]  On March 25, 2014, Plaintiff filed a Title II application for DIB and a Title XVI application for SSI.  [AR 12, 85]  In both applications, Plaintiff claimed a disability onset date of November 27, 2010, and thus Plaintiff was 35 years old at the time of the alleged onset.  [AR 12, 85-86]  Plaintiff claims disability based upon physical and mental impairments, including, but not limited to, a lower back injury, neck, right knee, right ankle, and hip impairments, arthritis, depression, and post-traumatic stress disorder ("PTSD").  [AR 85]  Plaintiff worked in a variety of positions prior to the alleged disability onset date, including as a teacher and a stage technician for an entertainment business. [AR 220]  Plaintiff worked as an accounts executive at a camera and lens manufacturer from February 2008 until November 27, 2010, the alleged onset date.  [*See* AR 198, 204, 220]  Plaintiff attempted to return to work sporadically in 2012 and 2013, including as a salesman for a television and satellite company, a driver for a hospitality business, and a driver for an agricultural farming operation, but he did not work at these positions for more than a period of a few months, and sometimes for only a matter of days.  [AR 196, 198, 204, 220]  Plaintiff's most recent prior work experience was as a driver for an oil fracking and delivery company for less than two months between the end of 2013 and the beginning of 2014.  [AR 185-86, 220, 638]

A.    **Medical Background**

Plaintiff has a long history of various struggles with his mental health, including alcohol abuse and attempts at detoxification and treatment, as well as neck and back

---

numerous forms completed by Plaintiff in written English [*see, e.g.*, AR 212-27], and Plaintiff's college education at an American university [AR 203], the representation that Plaintiff cannot read, understand, or write in English appears to be a mistake.

pain.  The Court includes an overview of Plaintiff's medical history with respect to each condition below.

### 1. Alcohol Abuse and Mental Health

Plaintiff was admitted to an alcohol rehabilitation program in November 2012 [AR 424] after admissions to the Denver Health Medical Center in July, August, and October of 2012 for alcohol detoxification [AR 345, 370-409].  He graduated from the program in December 2013, but relapsed in February 2014.  [AR 605]

Plaintiff presented for outpatient treatment for binge drinking following his relapse.  [AR 580-598]  He was assessed for anxiety, depression, PTSD, abuse and trauma in March 2014.  [AR 580, 588-89]  In April 2014, Plaintiff reported that he had been sober for 60 days, but also reported hearing sounds and inner voices, experiencing spiritual visions, and his belief in extrasensory perception ("ESP").  [AR 595]  Plaintiff was assessed with mood disorder not otherwise specified ("NOS"), alcohol dependence, and other conditions, and his provider discussed with him the option of treatment with antidepressants and mood stabilizers.  [AR 597-98]

Psychologist Russell Thye, Ph.D., completed a consultative examination report of Plaintiff at the direction of the Disability Determination Services on August 6, 2014.  [AR 637-42]  Dr. Thye noted that Plaintiff had post-trauma symptoms and a history of substance abuse, unusual thinking, hallucinosis, and mood disorders.  [AR 637]  Dr. Thye stated that Plaintiff was cooperative, had a good attitude, drove himself to the exam, and that his grooming, hygiene, and dress were appropriate.  [*Id.*]  Plaintiff reported depression, anxiety, feeling melancholy, loss of motivation, and being socially isolated with the exception of his roommates.  [AR 639-40]  Plaintiff also described

occasionally hearing voices or seeing visions consistent with his spirituality.  [AR 640]
Dr. Thye concluded that Plaintiff had relatively mild PTSD, adjustment disorder with
anxiety and depressed mood, and moderate alcohol use disorder, in remission.  [AR
641]  Dr. Thye found that Plaintiff's "primary barrier to work appears to be related to
back, neck and shoulder pain rather than anxiety and depression."[5]  [AR 641]  Dr. Thye
also concluded that Plaintiff's ability to maintain concentration, acceptable work
attendance, adapt to new situations, and  follow short, simple instructions were all
moderately impaired in light of Plaintiff's difficulties with concentration and history of
learning problems.  [*Id.*]

Dr. Anthony Gottlieb, a State agency psychological consultant, reviewed
Plaintiff's record in August 2014.  [*See* AR 97]  Dr. Gottlieb found that while Plaintiff may
have some limitations due to his mental health conditions, these limitations were "not at
the marked level."  [AR 92]  Dr. Gottlieb concluded that Plaintiff "retain[ed] the mental
ability to do work involving some skills but not involving more complex duties," and that
Plaintiff could be expected to do work that would require up to 6 months of time to learn
the necessary techniques, acquire information, and "develop facility needed for an
average job performance."  [AR 97]

A few months later, in October 2014, Plaintiff was again admitted to the
emergency department and assessed for alcohol intoxication.  [AR 750]  Providers
noted that Plaintiff could have "other underlying psych disease[s]," that he had "extreme

---

[5] Dr. Thye also commented on Plaintiff's physical impairments, finding that while
Plaintiff's gait was normal, "[h]e shifted positions frequently and seemed quite
uncomfortable by mid-exam due to pain."  [AR 637]  Dr. Thye explained that Plaintiff's
chief complaint was pain in his lower back, neck, shoulders, and right leg, and that he
described daily activities such as sitting and getting groceries as painful.  [*Id.*]  Plaintiff
reported that he occasionally would pass out because of the pain.  [AR 638]

flight of ideas," was "very tangential in speaking," and was hallucinating. [*Id.*] In December 2014, Plaintiff was evaluated for depression, potentially "related to . . . stressors including back pain [and] sobriety." [AR 806; *see also* AR 809-10]

Plaintiff began to see Dr. Thye for therapy beginning in February 2015. [AR 817] During the first few months of treatment, Dr. Thye noted that Plaintiff was able to maintain "anxiety and depression at fairly low levels," despite Plaintiff's financial difficulties, including homelessness [AR 819], and that Plaintiff was working hard to maintain his sobriety [AR 820]. However, in April 2015, Plaintiff was admitted to Centennial Peaks Hospital with severe manic behavior, including rapid and nonsensical speech and flight of ideas. [AR 717] Plaintiff's behavior prior to the hospitalization had prompted his roommates to call the police, and when police responded to bring Plaintiff to the hospital, they drew firearms. [*Id.*] Plaintiff was agitated in the emergency room, pulled out his IVs, and attempted to leave. [*Id.*] Plaintiff eventually stabilized after a six-day hospitalization. [*Id.*] Upon his release, Plaintiff presented to a mental health clinic, where he was evaluated as being able to care for himself, but as having less than adequate functioning in daily activities. [AR 781, 785]

Dr. Thye reported that Plaintiff was manic again during an appointment on May 12, 2015, and had come to the session appearing unshaven, to have lost weight, and generally unwell. [AR 717, 823-24] Plaintiff was irrational in his speech and thought process. [*Id.*] When Dr. Thye communicated his concerns, Plaintiff abruptly left for a surgical appointment with Dr. William Biggs. [AR 717; *see also* AR 709] Dr. Thye

followed up with Dr. Biggs[6] and called the police seeking a welfare check and hospitalization of Plaintiff, though the police did not follow through. [AR 717, 823-24] Plaintiff's behavior prompted Dr. Thye to change Plaintiff's diagnosis to bipolar I disorder, with the most recent episode being manic and severe with psychotic features. [AR 823-24] By June 8, 2015, Dr. Thye reported that Plaintiff's mania had subsided [AR 825], and over the next few months Dr. Thye noted that Plaintiff was open to interventions, making progress, and actively involved and proactive in his treatment [AR 826-28].

On November 3, 2015, Dr. Thye submitted a letter on Plaintiff's behalf, describing Plaintiff's treatment history and noting that in addition to Plaintiff's manic episodes, his primary barrier to working was "physical pain due to significant back and shoulder pain." [AR 717-18] Dr. Thye explained that Plaintiff would shift in his seat during appointments more than anyone he had ever seen, including in his time completing disability evaluations over the past 10 years. [AR 718] Dr. Thye concluded that Plaintiff was "currently unable to work due to debilitating manic episodes and severe chronic pain." [*Id.*]

### 2. Neck and Back Pain, and Related Impairments

Plaintiff has an extensive history of treatment for back and neck pain. Plaintiff's medical records reveal that while Plaintiff has sought and received consistent treatment, including undergoing physical therapy and injections, Plaintiff nevertheless has continued to report pain to his providers over the course of several years. [*See* AR 18-19]

---

[6] Dr. Biggs similarly reported that on May 12, "[t]hings ha[d] gotten quite a bit worse," and that Plaintiff's "thoughts seem[ed] to be all over the place." [AR 709]

Many of Plaintiff's physical complaints appear to date back, at least in part, to a September 2012 motor vehicle accident. [AR 263-305] A CT scan of the cervical spine following the accident found "[n]o acute fracture or subluxation," and that the "prevertebral soft tissues and paraspinal muscles appear[ed] within normal limits." [AR 296] Plaintiff returned to the emergency room on October 16, 2012, after a reported assault, complaining of wrist and knee pain. [AR 351-55] Plaintiff continued to seek treatment related to neck and back pain through the end of 2012 and beginning of 2013, but ultimately providers made no acute findings and found normal alignment of the spine, and no abnormal signal identified within the cervical vertebrae. [AR 417, 487-88, 495, 623-631]

In January 2013, an MRI of the cervical spine demonstrated mild diffuse disc bulges and mild bilateral neural foraminal stenosis at multiple levels, but no significant spinal stenosis. [AR 414-15, 424, 544] Plaintiff was diagnosed with diffuse multilevel disc pathology, spondylopathy, and lumbago, and began to treat this lower back pain condition through physical therapy. [AR 415, 424, 526-530] The following month, an MRI of Plaintiff's left shoulder revealed a complex extensive superior labral tear, with a small paralabral cyst and mild undersurface tearing of the distal fibers. [AR 418-19] Plaintiff underwent surgery in March 2013 to repair the left shoulder and for carpal tunnel decompression. [AR 453, 516] In April 2013, an MRI of the lumbar spine revealed disc bulges and protrusions. [AR 519-20, 551-52] Plaintiff's providers noted that while the MRI demonstrated degenerative changes, Plaintiff had been benefitting from physical therapy, "[wa]s doing well in general, and [wa]s hoping to start working soon." [AR 536] During this timeframe, Plaintiff continued to complain of pain in his

lower back, left shoulder, and legs, as well as numbness and joint pain in his hands and fingers.  [AR 513-14, 536-40, 617]

Plaintiff began to see David Columbus, Doctor of Osteopathic Medicine ("DO"), on July 17, 2013, complaining of back pain, stiffness, and decreased spine range of motion.  [AR 571, 574]  Dr. Columbus treated Plaintiff with lumbar injections for pain management.  [AR 573-76]  In August 2013, Plaintiff reported feeling much better from the injections, though he was still experiencing pain over the sacroiliac ("SI") joint area. [568]  Plaintiff continued to be treated with injections, including lumbar, shoulder, and SI joint injections and nerve intervention procedures, for pain management through at least mid-2015, when Plaintiff began to report that the injections were only providing minimal relief from the pain.  [*See, e.g.*, AR 610, 665, 705-06, 720-22, 801, 815]

Plaintiff first presented to Dr. Joshua Rusk on February 26, 2014.  [AR 609]  At that time, Dr. Rusk reported on Plaintiff's history of chronic pain, including in the lower back, neck, and shoulders.  [AR 609-11]  Over the subsequent months, Plaintiff continued to complain of shoulder and neck pain, and Dr. Rusk noted Plaintiff's chronic problems of cervical disc disease, shoulder injuries, lumbar degenerative disc disease, and spondylosis.  [AR 605]  Plaintiff explained that while the injections had helped intermittently, his back pain nevertheless increased within a few weeks.  [AR 606] Plaintiff was referred to physical therapy for lumbar spondylosis, degenerative disc disease, SI dysfunction, and cervical disc disease.  [AR 724]  Plaintiff has had consistent difficulty managing his pain, in part because his providers have been reluctant to prescribe opiates in light of his history of alcohol abuse.  [AR 724, 804, 818]

DO Kerry Kamer evaluated Plaintiff on August 7, 2014 at the direction of the Colorado Department of Human Services Disability Determination Services. [AR 646] Dr. Kamer found that Plaintiff had normal, unassisted gait throughout the examination, and no discernible discomfort with normal ranges of motion of the shoulder joints. [AR 649, 651] She determined that Plaintiff exhibited "[s]elf-limiting and sub-maximal effort" during strength testing and made "minimal positive findings and an overall unremarkable functional evaluation." [AR 652] She did not recommend any limitations with respect to Plaintiff's ability to sit, stand, or walk during an 8-hour work day. [*Id.*] She concluded that Plaintiff should be able to lift and carry 20 pounds frequently, 40 pounds occasionally, and she did not recommend any limitations "associated with bending, stooping, squatting, crouching, and/or crawling." [*Id.*]

Shortly after the consultative exam with Dr. Kamer, Plaintiff reported to Dr. Rusk, stating that his lower back was deteriorating and that the pain was radiating down his right leg. [AR 815] Plaintiff was scheduled for an appointment to discuss possible nerve intervention treatment. [*Id.*] Plaintiff continued to report and seek treatment with various providers for back pain, sometimes radiating to his legs, shoulder pain, and occasionally knee pain, at least through November 3, 2015, with appointments as often as multiple times a week. [*See, e.g.*, AR 675, 681, 689, 705-706, 729, 733-35, 769, 801-15, 829] Dr. Columbus continued to treat Plaintiff for pain management, including with injections [AR 809] in the months following Dr. Kamer's examination, and Plaintiff continued to participate in physical therapy [AR 806]. In October 2014, Plaintiff was assessed with acromioclavicular ("AC") joint degenerative changes, biceps tendinitis, and superior labral tearing with an associated cyst, and underwent injections in his

shoulder. [AR 740] A provider also noted that conservative management of shoulder pain with physical therapy had failed. [AR 768] In November 2014, Plaintiff was found to not have any significant limitation of motion with respect to the lumbar spine, but pain for all ranges of motion in his shoulders, with more pain in the right shoulder. [AR 729]

On January 6, 2015, Dr. Columbus completed the Colorado Department of Human Services Med-9 Form, finding that Plaintiff "has been or will be totally and permanently disabled to the extent [he was] unable to work full time at any job due to a physical or mental impairment," on the basis of Plaintiff's spinal impairments. [AR 658] Dr. Columbus indicated that Plaintiff's disability was expected to last at least 12 months. [*Id.*] Following another examination of Plaintiff, Dr. Rusk completed the same form on February 3, 2015, making the same findings, and also determining that the disability was expected to last for at least 12 months "given [the] chronicity of [Plaintiff's] pain issues." [AR 660, 801] During the examination of Plaintiff, Dr. Rusk noted that Plaintiff was "[d]oing much better generally with the low back, but after sitting or long periods of time, or lots of activity," he still experienced the pain. [AR 802] Plaintiff reported that even simply moving the mouse at the computer would give him significant shoulder pain. [*Id.*]

In appointments throughout 2015, providers noted that Plaintiff described chronic pain management, persistent pain in his knee, shoulder, and back, and his need to frequently change positions due to the pain. [AR 671-77, 681-86, 689, 735] In May 2015, Dr. Biggs assessed Plaintiff for radiculopathy and some disc degeneration but found no significant stenosis. [AR 709] That same month, Dr. Sean Grey found that Plaintiff's pain was "out of proportion" with physical findings, but also noted tenderness

at the AC joint, impingement, and other pain with shoulder motions. [AR 710] Plaintiff underwent surgery of his right shoulder in June 2015 to correct a superior labral tear. [AR 762-63] Several weeks after the surgery, Dr. Grey stated that plaintiff was doing well, making progress in physical therapy, and returning to many of his "desired activities." [AR 714]

### 3. Procedural History

Plaintiff's applications for DIB and SSI were initially denied on August 20, 2014. [AR 99-100] On September 16, 2014, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR 122] A hearing was conducted before ALJ Kelley Day on November 4, 2015, at which Plaintiff and vocational expert ("VE") Deborah Christensen both testified. [AR 29-79] Plaintiff was represented at the hearing by attorney Tracy Cooke. [*See* AR 29-30]

On December 30, 2015, the ALJ issued a decision denying Plaintiff benefits. [AR 12-23] Plaintiff timely requested a review of that decision by the Appeals Council [*see* AR 7-8], which denied his request for review on January 23, 2017 [AR 2-4]. Plaintiff timely filed an appeal with this Court on March 23, 2017. [#1] Because the Appeals Council denied Plaintiff's appeal, the ALJ's decision is the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481, 422.210.

### 4. The ALJ's Decision

The ALJ denied Plaintiff's applications for DIB and SSI after evaluating the evidence pursuant to the five-step sequential evaluation process. [AR 12-23] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity

since November 27, 2010, the alleged onset date. [AR 14] At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine with spondylosis; degenerative disc disease of the cervical spine; status post shoulder labral repairs bilaterally; anxiety disorder; mood disorder; and substance abuse (alcohol) in early sustained remission. [*Id.*] At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically exceeds the severity of one of the listed impairments in the appendix of the regulations. [AR 15-16]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) [AR 16-21], but with the following limitations:

> [Plaintiff] can never climb ladders, ropes or scaffolds. [Plaintiff] can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, and crawl. He must avoid hazards like unprotected heights and dangerous moving machinery. [He] can only work in low stress positions, define[d] as positions that require only occasional decision making and occasional adapting to change. He cannot perform any fast-paced production quota work. [Plaintiff] can sit consecutively for one hour, and then he would need to get up and move around. He can frequently reach overhead bilaterally.

[AR 16-17] The ALJ provided a narrative setting forth the relevant evidence considered in determining the RFC and assigned weight to each of the medical opinions in the record. [AR 17-21]

At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work, including his work as a truck driver, sales clerk, film editor, stage technician, training representative, and teacher. [AR 21] Finally, at step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can

perform.  [AR 23]  Specifically, the ALJ agreed with the VE's testimony opining that Plaintiff could perform the following representative occupations:  cashier, cleaner/housekeeper, telephone clerk, and ticket checker.  [AR 22]  Accordingly, the ALJ determined that Plaintiff was not under a disability from November 27, 2010 through December 30, 2015 (the date of the ALJ's decision).  [AR 22-23]

## III.  ANALYSIS

Plaintiff argues on appeal that the RFC determined by the ALJ was not supported by substantial evidence for three reasons.  [#16]  First, Plaintiff contends that the ALJ failed to properly analyze and weigh the medical opinions with respect to Plaintiff's mental impairments.  [*Id.* at 16-18]  Second, Plaintiff maintains that the ALJ failed to properly interpret and evaluate the medical opinions regarding Plaintiff's physical limitations.  [*Id.* at 18-20]  Third, Plaintiff argues that the ALJ failed to fully account for Plaintiff's mental impairments in the RFC.  [*Id.* at 20-21]

As noted above, at step four, the Commissioner must determine whether the claimant's RFC—the functional capacity the claimant retains despite his impairments— is sufficient to allow the claimant to perform his past relevant work, if any.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan*, 399 F.3d at 1261; *Bailey*, 250 F. Supp. 3d at 784.  The RFC assessment must "be based upon all relevant evidence in the record," and should consider the claimant's physical abilities, "such as sitting, standing, walking, lifting, [and] carrying," and mental abilities, including any "limitations in understanding, remembering, and carrying out instructions."  *Jones v. Astrue*, 500 F. Supp. 2d 1277, 1282 (D. Kan. 2007) (citing 20 C.F.R. §§ 404.1545, 416.945).  The RFC should also consider the claimant's ability to "respond[] appropriately to supervision, co-

workers, and work pressures in a work setting," among other abilities. *Id.* (quoting 20 C.F.R. §§ 404.1545(c), 416.945(c)). The ALJ must show how the evidence supported each finding in the RFC, including citing to "*specific* medical facts . . . and nonmedical evidence." *Southard v. Barnhart*, 72 F. App'x 781, 784 (10th Cir. 2003); *see also Moon v. Barnhart*, 159 F. App'x 20, 22-23 (10th Cir. 2005).

In considering medical opinions, the "ALJ must evaluate every medical opinion in the record . . . although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (internal citation omitted). The regulations governing the Commissioner's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians. *Boyd v. Berryhill*, No. 17-CV-00722-MEH, 2017 WL 4877213, at *11 (D. Colo. Oct. 30, 2017); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

"According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c)(2) (stating that "[g]enerally, [the Commissioner] give[s] more weight to medical opinions from [the claimant's] treating sources"), 416.927(c)(2) (same). In determining how much weight to be given to a

treating physician's opinion, the ALJ must first determine whether the opinion qualifies for "controlling weight." To make that determination, the ALJ

> [M]ust first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is "no," then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (internal quotations and citations omitted). Even if the treating physician's opinion is not entitled to controlling weight, however, it is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Id.* (quotation omitted). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (quotation omitted). The ALJ need not explicitly discuss each of these six factors in determining what weight to give a medical opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the ALJ "must give good reasons ... for the weight assigned to a treating physician's opinion, that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (internal quotations omitted). "[I]f the ALJ rejects the opinion completely, he must then

give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (quotations omitted).

## A. The ALJ's Consideration of Opinion Evidence On Mental Impairments

First, Plaintiff argues that the ALJ erred by only giving "little weight" to Dr. Thye's November 2015 opinion as Plaintiff's treating psychologist ("the 2015 Opinion"), which stated that Plaintiff was currently unable to work due to debilitating manic episodes and severe chronic pain [AR 718]. [#16 at 16] The ALJ stated that Dr. Thye's treatment notes "d[id] not support the limitations he described." [AR 20] Plaintiff contends that the ALJ's explanation "is insufficient and does not allow for meaningful judicial review by this Court," because the ALJ did not explain the purported inconsistencies, and because the record demonstrates that Dr. Thye's opinion was, in fact, consistent with his treatment notes. [#16 at 16 (citing [AR 20])] Plaintiff also argues that the ALJ erred in only partially crediting Dr. Thye's consultative opinion from August 2014 ("the 2014 Opinion") [*id.* at 17], and by affording more weight to the opinion of the Agency's non-examining psychological consultant Dr. Gottlieb [*id.* at 16, 18].

Courts in the Tenth Circuit have held that the ALJ must give specific reasons for rejecting a treating physician's opinion on the grounds that it is inconsistent with his or her treatment notes, or the medical evidence in the record. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004); *Angster v. Astrue*, 703 F. Supp. 2d 1219, 1227 (D. Colo. 2010) (remanding where the ALJ rejected the treating nurse practitioner's opinion as inconsistent with her own treatment notes, but did not discuss any specific inconsistencies, and where the treatment notes appeared to support the opinion). In *Langley v. Barnhart*, the ALJ refused to give the claimant's treating

psychiatrist's opinion controlling weight, explaining that it was unsupported by the objective medical evidence, including the psychiatrist's own records. 373 F.3d at 1121-22. The Tenth Circuit reasoned that while "[t]he ALJ provided a facially valid reason" for not affording the opinion controlling weight—that it was inconsistent with other evidence in the record—the court could "find no obvious inconsistencies" between the psychiatrist's treatment notes and the record evidence, and his opinion. *Id.* at 1122. The court ordered remand to the Commissioner, concluding that "[b]ecause the ALJ failed to explain or identify what the claimed inconsistencies were between [the psychiatrist's] opinion and the other substantial evidence in the record, his reasons for rejecting that [we]re not 'sufficiently specific' to enable th[e] court to meaningfully review his findings." *Id.* at 1123 (quoting *Watkins*, 350 F.3d at 1300); *see also Angster*, 703 F. Supp. 2d at 1227.

Similarly, in *O'dell v. Colvin*, this Court remanded to the Commissioner where the ALJ had not explicitly addressed purported inconsistencies between the treating physician's opinion, and his treatment notes and the evidence of record. No. 15-cv-00628-CBS, 2016 WL 5395247, at *3-5 (D. Colo. Sept. 27, 2016). There, the ALJ gave the treating physician's opinions little weight, concluding that they were "extreme compared to [the treating physician's] own observations and findings, the claimant's performance during the consultative examination and the objective medical evidence." *Id.* at *4 (citation omitted). The Court concluded that "[w]ithout any supporting evidentiary citations or specificity, the ALJ's assertions regarding Dr. Garcia's opinions are little more than conclusory statements and must be remanded for further explanation." *Id.* at *5. More specifically, the Court explained that the ALJ did "not

specify" which opinions he considered to be extreme, in comparison to which particular observations and findings by the treating physician, and it was also "entirely unclear which aspects of the consultative examination the ALJ was relying upon." *Id.* at *4. Moreover, the ALJ "ha[d] made no effort at discussing—or even citing—the specific portions of the objective evidence that support his position." *Id.* The Court rejected the Commissioner's argument that the ALJ had thoroughly discussed the medical evidence in other parts of the opinion and was not required to repeat the evidence he had already addressed. *O'dell*, 2016 WL 5395247, at *4-5 (citing *Endriss v. Astrue*, 506 F. App'x 772 (10th Cir. 2012)). The Court reasoned that "[a]lthough the ALJ did discuss the medical records in general—and made various observations regarding how these records reflected Plaintiff's alleged limitations—he did not attempt to make any specific connections between this objective evidence," and the treating physician's opinion "or the weight that should be afforded to it." *Id.* at *5.

Other courts in this Circuit have remanded to the Commissioner under similar circumstances. *See, e.g.*, *Maez v. Berryhill*, No. 1:16-cv-00766-LF, 2017 WL 6397726, at *8 (D.N.M. Dec. 14, 2017) (remanding where, although the ALJ discussed some of the treating physician's medical records, the decision was "devoid of any specific discussion of [the treating physician's] opinions, and how these opinions [we]re 'not supported [or] [we]re inconsistent with his own treatment notes'"); *Galindo v. Berryhill*, No. CV 16-804 CG, 2017 WL 3207914, at *4 (D.N.M. May 3, 2017) (finding that an ALJ "may not reject an opinion as unsupported by the evidence without explaining how the opinion and evidence conflict"); *Valenzuela v. Berryhill*, No. CV 16-522 CG, 2017 WL 3207159, at *4 (D.N.M. May 2, 2017) (holding ALJ's discussion of evidence in

considering claimant's credibility was insufficient to reject treating physician's opinion because Court was "left to guess at how exactly [the treating physician's] findings were unsupported by the record").

### 1. Dr. Thye's Opinions

The reasoning from the cases discussed above applies with equal force here. Although the ALJ did address Plaintiff's mental health history at length [AR 19-20], the ALJ decided to give "little weight" to Dr. Thye's 2015 Opinion that Plaintiff was currently unable to work due in part to debilitating manic episodes [AR 718], on the grounds that "the treatment notes do not support the limitations" that Dr. Thye described [AR 20]. The ALJ did not explain which portions of Dr. Thye's treatment notes were inconsistent with his opinion, leaving this Court to speculate and improperly "undertake a post hoc effort to justify the ALJ's conclusions." *O'dell*, 2016 WL 5395247, at *5; *see also Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004).

Moreover, the Court can "find no obvious inconsistencies" between Dr. Thye's opinion and his treatment notes. *Langley*, 373 F.3d at 1122. Plaintiff began therapy with Dr. Thye in February 2015. [AR 817] In April 2015, Dr. Thye noted that Plaintiff had "gotten himself into some trouble with the police and had stayed up several days without sleep." [AR 821] Dr. Thye stated that "[i]t was difficult to tell if this was a manic episode" because Plaintiff had exhibited this behavior as a manner of "thrill-seeking." [*Id*.] Plaintiff ultimately "los[t] control" and was hospitalized. [*Id*.] Dr. Thye also noted Plaintiff's recent bipolar disorder diagnosis by a psychiatrist. [*Id*.] Plaintiff presented to a mental health clinic after the hospitalization, where he was evaluated as being able to care for himself, but as having less than adequate functioning in daily activities. [AR

781, 785]  Dr. Thye reported that Plaintiff was manic again during an appointment in May 2015, and had come to the session appearing generally unwell, unshaven, and appearing to have lost weight.  [AR 823-24]  After Plaintiff abruptly ended the appointment, Dr. Thye felt it necessary to call the police seeking a welfare check and hospitalization of Plaintiff.  [AR 823-24]  Plaintiff's behavior also prompted Dr. Thye to change Plaintiff's diagnosis to bipolar I disorder, with the most recent episode being manic and severe with psychotic features.  [*Id.*]  A few weeks later, Dr. Thye reported that Plaintiff's mania from the prior appointment had subsided [AR 825], and over the next few months Dr. Thye noted that Plaintiff was open to interventions, making progress, and actively involved and proactive in his treatment [AR 826-28].  It is unclear how Dr. Thye's opinion that Plaintiff "was currently unable to work due to debilitating manic episodes" was inconsistent with these treatment notes and other evidence from the record.  [AR 718]

The Commissioner argues that the ALJ reasonably gave little weight to the 2015 Opinion, including because many of Plaintiff's extreme symptoms resulted from Plaintiff's alcohol abuse, as the ALJ stated elsewhere in her opinion.  [#17 at 10-11 (citing AR 19)]  In other words, the Commissioner seems to suggest that because Plaintiff's mental health issues were predominately tied to alcohol abuse, there was no basis for Dr. Thye's opinion that Plaintiff could not work, in light of Plaintiff's recent sobriety.  But the ALJ did not explicitly use this rationale when affording Dr. Thye's opinion little weight.  And in any event, the Commissioner's argument seems to be contradicted by the record.  Dr. Thye's 2015 Opinion indicated that Plaintiff had been sober for three years as of November 2015, with minor relapses [*see id.* at 11 (citing AR

718)], which would suggest that Plaintiff's manic episodes in April and May 2015 were *not* related to his struggles with alcohol abuse. [*See, e.g.*, AR 605 (describing alcohol relapse in February 2014); AR 810 (noting alcohol relapse in September 2014); AR 790 (April 2015 treatment note indicating alcohol dependence was in remission)]

Plaintiff also argues that the ALJ erred in only partially crediting Dr. Thye's consultative examination findings in his 2014 Opinion. [#16 at 15] The ALJ afforded the 2014 Opinion "partial weight" because Dr. Thye's findings were "consistent with the mental status examination of" Plaintiff, which Dr. Thye conducted on August 6, 2014. [AR 21] The ALJ concluded, however, that the RFC she had determined was "more consistent with the medical evidence of record." [*Id.*] As discussed above, the Court finds that these conclusory statements are insufficient to demonstrate why the ALJ afforded partial weight to the 2014 Opinion. Moreover, it is unclear how, if at all, the ALJ weighed the fact that Dr. Thye's 2014 Opinion was rendered several months prior to Dr. Thye beginning a treatment relationship with Plaintiff, and nearly a year prior to Plaintiff's manic episodes. The Court addresses the issue of considering a claimant's changing condition over time with respect to Dr. Gottlieb's opinion below.[7]

---

[7] Plaintiff also apparently failed to recognize this discrepancy. Plaintiff argued, "[s]omehow, the ALJ concluded that Dr. Thye's [2014] consultative examination findings were consistent with the mental status examination, but his [2015] letter opinion was inconsistent with his treatment notes." [#16 at 17] The Court does not find this argument persuasive because over a year had passed between Dr. Thye's consultative examination in August 2014 [AR 637-42], and his 2015 Opinion, written in November 2015, after several months of treating Plaintiff and changing his diagnosis to bipolar I disorder [AR 717-18, 817-29]. In fact, other courts have remanded to the Commissioner where the ALJ attempted to compare between assessments in different years, as Plaintiff seems to suggest the ALJ should have done here. *See, e.g.*, *Tsosie v. Berryhill*, No. 1:16-cv-00503-LF, 2017 WL 4041848, at *9 (D.N.M. Sept. 12, 2017) (finding ALJ's assertion that physician's March 2014 assessment was inconsistent with his April 2013 assessment was "an argument based on the logical fallacy of false

### 2. Dr. Gottlieb's Opinion

Plaintiff next argues that the ALJ erred by affording more weight to the opinion of the Agency's non-examining psychological consultant, Dr. Gottlieb, than to either of Dr. Thye's opinions. [#16 at 16, 18] The ALJ afforded "some weight" to Dr. Gottlieb's consultative opinion, which was rendered after a review of Plaintiff's medical record in 2014 [AR 20; *see also* AR 92-97].

An ALJ cannot discount an opinion about the claimant's deteriorating condition that is supported by the record, in favor of a prior finding that the claimant would be able to return to work. *Harris v. Sec'y of Health & Human Servs.*, 821 F.2d 541, 544 (10th Cir. 1987); *see also Jaramillo v. Colvin*, 576 F. App'x 870, 874 (10th Cir. 2014) (noting the significance of a recent physician's examination that found more limitations than an examination by another physician two years prior). For example, in *Salazar v. Berryhill*, the court remanded to the Commissioner, in part due to the ALJ's failure to "address how the more recent medical evidence of [claimant's] deteriorating condition might have impacted" the medical opinions of the State Agency consultants or "demonstrate that [the ALJ] considered the relative age of the State Agency opinions when he accorded them great weight." No. CV 16-271 KK, 2017 WL 5634243, at *8 (D.N.M. Nov. 22, 2017); *see also Montoya v. Colvin*, No. CV 15-365 KG/GBW, 2016 WL 10179240, at *4 (D.N.M. July 29, 2016).

---

equivalence" because the claimant's condition "was not static, and his pain level and medical diagnoses changed throughout the course of his treatment.").

Even though Plaintiff failed to address the impact of his changing condition on the medical opinion evidence here, "[t]his Court cannot . . . ignore obvious and prejudicial errors, even if the litigants did not identify and debate them." *Womack v. Astrue*, No. CIV–07–167–W, 2008 WL 2486524, at *5 (W.D. Okla. June 19, 2008); *see also Truesdale v. Colvin*, No. CIV-12-1307-HE, 2014 WL 549377, at *4 (W.D. Okla. Feb. 11, 2014) (collecting cases).

The ALJ gave Dr. Gottlieb's opinion "some weight" because it was consistent with the claimant's treatment history. [AR 20] Again, the ALJ did not provide specific reasons for why this opinion was consistent with the treatment history. *See, e.g.*, *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it" and "give good reasons in his written decision for the weight he gave to the treating physician's opinion"). Moreover, although not addressed by Plaintiff, the ALJ here apparently did not consider or address the fact that Dr. Gottlieb rendered his opinion of Plaintiff's mental limitations in August 2014, after a review of Plaintiff's medical records at the time, nearly a year prior to Plaintiff's manic episodes, and several months before Plaintiff began counseling with Dr. Thye. [*Compare* AR 92-97, *with* AR 817-29] Although the ALJ should consider the record with respect to the entire disability period, *see Andersen v. Astrue*, 319 F. App'x 712, 722 (10th Cir. 2009), in weighing Dr. Gottlieb's opinion more heavily than Dr. Thye's 2015 Opinion, the ALJ here should have demonstrated that she considered the relative age of Dr. Gottlieb's opinion in light of Plaintiff's manic episodes in 2015, which may have suggested a deterioration of Plaintiff's mental health. *See, e.g.*, *Salazar*, 2017 WL 5634243, at *8.

For these reasons, the ALJ did not apply the correct legal standards in considering the medical opinion evidence with respect to Plaintiff's mental impairments.

## B. The ALJ's Consideration of Opinion Evidence On Physical Impairments

Plaintiff next argues that the ALJ failed in only affording "little weight" to the opinions of Plaintiff's treating physicians, Dr. Columbus and Dr. Rusk. [#16 at 18-20] Both doctors completed Colorado Department of Human Services Med-9 Forms

indicating that Plaintiff was unable to work full time due to a musculoskeletal disorder for at least 12 months or more.[8]  [AR 658, 660; *see also* AR 801]  The ALJ assigned little weight to both opinions, finding that Dr. Columbus' opinion was not consistent with Plaintiff's treatment history, and that Dr. Rusk's "statement [wa]s a form and d[id] not provide a narrative summary of the claimant's limitation," and "[wa]s not consistent with the evidence of record, including the findings upon physical examination of the claimant."  [AR 21]

Again, if the ALJ is giving a treating physician's opinion less than controlling weight, the opinion is "still entitled to deference and must be weighed using all of the relevant factors" under 20 C.F.R. § 404.1527(d) and *Watkins*, 350 F.3d at 1300-01.  *See Langley*, 373 F.3d at 1120.  This standard applies, even if the treating physician's opinion is communicated through the completion of a brief form.  In *Andersen v. Astrue*, the ALJ found that the treating physician opinions were entitled to little weight because they were not supported by the evidence, and because the opinions were "forms . . . with check off boxes" with no narrative rationale or reasoning included.  319 F. App'x at 721.  The Tenth Circuit reversed and remanded.  *Id.* at 723-25.  First, the court explained that the ALJ apparently failed to consider any factor under 20 C.F.R. §

---

[8] On Dr. Rusk's form, there is an illegible mark above the box in Section 2, which, if selected, would indicate a finding that the individual is not totally disabled, but has a physical or mental impairment substantially precluding the person from engaging in his usual occupation for six months.  [AR 660]  The ALJ concluded that Dr. Rusk had in fact checked this box "indicating the claimant was not able to engage [in] his normal occupation for six months."  [AR 21 (citation omitted)]  But also on the same form, Dr. Rusk specified that Plaintiff was or would be permanently disabled and unable to work due to a musculoskeletal disorder for 12 months or more.  [AR 660]  And, in contemporaneous treatment notes, Dr. Rusk noted that he had completed the Med-9 "for '12 mo or greater' disability given chronicity of pain issues."  [AR 801]  Accordingly, the Court presumes that Dr. Rusk's opinion was that Plaintiff would be permanently disabled for 12 months or more.

404.1527(d), other than whether the physicians' opinions were supported by relevant evidence. *Id.* at 722. Although the Court acknowledged that "the ALJ is under no obligation to *explicitly discuss* each factor," "the ALJ's cursory treatment of the physicians' opinions in this case d[id] not satisfy [the Court] that the ALJ *considered* all the relevant factors." *Id.* at 722-23; *see also O'dell*, 2016 WL 5395247, at *5 (court noting its concern that the ALJ had singularly relied upon the degree to which the ALJ's opinion was supported by the evidence, and had failed to consider factors such as "the length of the treatment relationship and frequency of examining").

The court also rejected the ALJ's reasoning that she discounted the treating physician opinions "because they used forms with check off boxes and little reasoning was articulated on those forms." *Andersen*, 319 F. App'x at 723. The court reasoned that while "[e]xplanatory material is certainly relevant" in weighing a treating physician's opinion, the court was "unwilling to categorically reject forms completed by treating physicians that lack such material," especially in light of the fact that the treating physicians actually examined the patient, and other materials in the record could support the conclusions on the forms, including treatment records. *Id.* at 723-24. The Court concluded that the forms' minimal clinical commentary did not support the inference that the treating physicians' opinions "were of limited reliability." *Id.* at 724; *see also Angster*, 703 F. Supp. 2d at 1228 n.2 ("While the Commissioner argues that an opinion on a 'checked-box form[,] especially a "Med-9" form[,]' is not entitled to special weight, that is not accurate particularly in light of the fact that [the provider] had a treatment relationship with Plaintiff that lends support to her opinions in the form.").

Applied here, the Court again finds that the ALJ's conclusory rejection of Plaintiff's treating physicians' opinions was not "sufficiently specific to make clear to any subsequent reviewers" the reason for the little weight given to those opinions. *Langley*, 373 F.3d at 1119 (internal quotations omitted). The ALJ did not explain precisely how the medical opinions of Dr. Columbus and Dr. Rusk were inconsistent with Plaintiff's treatment history or the medical evidence, or cite to the specific parts of the record that purportedly undermined the opinions. *See, e.g.*, *O'dell*, 2016 WL 5395247, at *4.

Defendant, like the Commissioner in *O'dell*, cites to *Endriss* for the proposition that the ALJ was not required to repeat evidence he already addressed. [#17 at 14 (citing *Endriss*, 506 F. App'x at 777)]; *see also O'dell*, 2016 WL 5395247, at *4. Like the Court in *O'dell*, the Court acknowledges that the ALJ discussed the medical evidence in depth throughout the opinion. [*See* AR 17-20] However, the ALJ failed to make the connection between treatment notes, medical evidence, and the purported inconsistencies between these records and Dr. Columbus' and Dr. Rusk's opinions. *See O'dell*, 2016 WL 5395247, at *5. The Court "decline[s] the Commissioner's invitation to draw analytical connections not present in the ALJ's decision" between the record and the treating physician opinions. *Maez*, 2017 WL 6397726, at *8. "Affirming this post hoc effort to salvage the ALJ's decision would require [the Court] to overstep [its] institutional role and usurp essential functions committed in the first instance to the administrative process." *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004).

Furthermore, like the ALJ in *Andersen*, there is no indication that the ALJ considered any factor other than supportability in rejecting the opinions of Dr. Columbus and Dr. Rusk. For example, there is no acknowledgment of Plaintiff's longstanding

treatment relationship with Dr. Columbus beginning as early as July 2013 [AR 571, 574], or Dr. Rusk's treatment of Plaintiff since at least February 2014 [AR 609].  Finally, the Court is not persuaded by the ALJ's rationale that the opinions were presented in "a form and d[id] not provide a narrative summary of the claimant's limitation" [AR 21], especially because Drs. Columbus and Rusk were Plaintiff's treating physicians and the ALJ could have looked to their extensive treatment notes to supplement their opinions on the Med-9 forms.  *See Andersen*, 319 F. App'x at 723-24.

For these reasons, the ALJ did not apply the correct legal standards in considering the medical opinion evidence regarding Plaintiff's physical limitations and, on the present record, the reasons the ALJ gave for weighing the various opinions do not appear to be supported by substantial evidence.

The Court need not address the other argument raised by Plaintiff because the ALJ's errors in weighing the opinion evidence alone warrants reversal and remand.  *See Watkins*, 350 F.3d at 1299; *O'dell*, 2016 WL 5395247, at *2.  The Court makes no determination with respect to whether Plaintiff was disabled during the relevant period or whether he should be awarded benefits.  The Court leaves those issues to be determined by the Commissioner after further proceedings.

IV.    **CONCLUSION**

Accordingly, for the foregoing reasons, the Court **REVERSES** the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA from November 27, 2010 through December 30, 2015 and **REMANDS** this matter to the Commissioner for rehearing and reconsideration consistent with this Order.

DATED:  February 9, 2018

BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge